UNITED STATES of America,
Plaintiff-Appellee,

v.

David Lee BROWN,
Defendant-Appellant.

UNITED STATES of America,
Plaintiff-Appellee,

v.

Terry Francis GALLAGHER,
Defendant-Appellant.

UNITED STATES of America,
Plaintiff-Appellee,

v.

Clayton COLWELL, Jr.,
Defendant-Appellant.

UNITED STATES of America,
Plaintiff-Appellee,

v.

James ADAMS, III, Defendant-Appellant.

UNITED STATES of America,
Plaintiff-Appellee,

v.

Donald E. PITTS, Defendant-Appellant.

UNITED STATES of America,
Plaintiff-Appellee,

v.

Kenneth L. HALE, Defendant-Appellant.

Nos. 76–1924 to 76–1929.

United States Court of Appeals,
Sixth Circuit.

Argued April 4, 1977.

Decided Feb. 7, 1978.

Don A. Little, Kettering, Ohio (Court-appointed CJA), for David Lee Brown.

Gerald R. Westbrock (advisor), Dayton, Ohio, Terry Francis Gallagher in pro per., for Terry Francis Gallagher.

Alex V. DeMarco, Vandalia, Ohio (Court-appointed CJA), for Clayton Colwell.

Daniel J. O'Brien, Dayton, Ohio (Court-appointed CJA), for John Adams, III.

Richard S. Dodge, Dayton, Ohio (Court-appointed CJA), for Donald E. Pitts.

Richard M. Hunt, Cromer, Faber & Hunt, Dayton, Ohio (Court-appointed CJA), for Kenneth L. Hale.

William W. Milligan, U. S. Atty., Columbus, Ohio, Terry W. Lehmann, Robert A. Steinberg, Dayton, Ohio, for plaintiff-appellee.

Before EDWARDS, PECK and LIVELY, Circuit Judges.

JOHN W. PECK, Circuit Judge.

In early 1975, defendant-appellant David Lee Brown developed an organization that was responsible for a series of "commando-type" raids on banks in southwestern Ohio. The members of the organization were either friends or relatives of appellant Brown. The banks robbed included the Security National Bank in Eaton, Ohio; the First National Bank in Fairborn, Ohio; the Third National Bank, Salem Avenue Branch, in Dayton, Ohio; the Winters National Bank in Dayton, Ohio; the Huntsville State Bank in Bellefontaine, Ohio; the Central Trust Company in Englewood, Ohio; and the Miami Citizens Bank in Troy, Ohio.

A common method of robbing these banks was used by the appellant Brown organization. Prior to the robbery, the bank to be robbed and the getaway route were carefully surveyed, and practice runs using the getaway route were made. Subsequently, several members of the organization would enter the bank wearing ski masks and gloves and carrying guns. One of the bank robbers would station himself in a place in the bank lobby so that he could keep bank personnel and customers under control. The other robbers would go behind the tellers' counters and take the currency located there. All of this activity in the bank was timed to be done as rapidly as possible. Once the money was taken from behind the counters, the gang would quickly leave, having been inside the bank for approximately a minute, and drive away in a stolen car. In order to confuse the police, the getaway car would have license plates stolen from a second car. After driving a short distance from the bank, the getaway car would be abandoned and another car would be used to drive to a "safe house." At the "safe house," the money taken in the robbery would be divided among the participants in the robbery and the owner of the "safe house." The participants in the robbery would shower and change clothes. Weapons used and clothing worn during the robbery would be destroyed. Several days later, members of the appellant Brown organization would meet to exchange information about the robbery.

In January, 1976, a federal grand jury for the Southern District of Ohio returned an eleven count indictment against nine individuals named as defendants and thirteen other individuals named as unindicted co-conspirators. All of the persons named in the indictment had been at one time associated with appellant Brown's bank robbery organization. Count I of the indictment charged all nine defendants with conspiracy to commit armed bank robbery in violation of 18 U.S.C. § 371. The remaining ten counts in the indictment charged each of the nine defendants with at least one count of armed bank robbery in violation of 18 U.S.C. § 2113(a) and (d) and 18 U.S.C. § 2.

Defendants Robert Grimes, Harry J. Mabe, and Earl D. Ledbetter pleaded guilty to the conspiracy count in the indictment. Defendants-appellants David Lee Brown, Terry Francis Gallagher, Clayton Colwell, Jr., James Adams, III, Donald Edward Pitts, and Kenneth Leon Hale were tried by a jury in a trial that lasted from April 26 to May 15, 1976. The jury found all six of these appellants guilty of the conspiracy charge, and in addition found appellant Brown guilty of three counts of armed bank robbery, appellant Gallagher guilty of three counts of armed bank robbery, appellant Colwell guilty of four counts of armed bank robbery, appellant Adams guilty of six counts of armed bank robbery, and appel-

lant Hale guilty of three counts of armed bank robbery.[1] After being sentenced by the district court,[2] appellants perfected this appeal. We affirm the convictions.

1. The following is a summary of the substantive armed bank robbery counts in the indictment and the findings of the jury as to the appellants.

| Count of the Indictment | Bank Name Location Date | Defendants Charged | Finding of the Jury |
|---|---|---|---|
| II | Third National Bank North Main Branch Dayton, Ohio January 23, 1975 | Colwell Adams | Not Guilty Not Guilty |
| III | Security National Bank Medway, Ohio January 31, 1975 | Brown Gallagher Colwell Adams Mabe | Guilty Guilty Guilty Guilty — |
| IV | Eaton National Bank Eaton, Ohio March 22, 1975 | Pitts | Not Guilty |
| V | First National Bank Fairborn, Ohio April 18, 1975 | Colwell Adams Grimes | Guilty Guilty — |
| VI | Security National Bank Springfield, Ohio April 21, 1975 | Ledbetter | — |
| VII | Third National Bank Salem Avenue Branch Dayton, Ohio May 1, 1975 | Brown Gallagher Adams | Guilty Guilty Guilty |
| VIII | Winters National Bank Salem Mall Branch Dayton, Ohio May 30, 1975 | Gallagher Colwell Adams | Guilty Guilty Guilty |
| IX | Huntsville State Bank Bellefontaine, Ohio June 9, 1975 | Brown Hale | Guilty Guilty |
| X | Central Trust Company Englewood, Ohio June 19, 1975 | Colwell Adams Hale | Guilty Guilty Guilty |
| XI | Miami Citizens Bank Trojan Village Branch Troy, Ohio August 7, 1975 | Colwell Adams Hale | Guilty Guilty Guilty |

2. On May 26, 1976, the district judge sentenced the appellants. Appellant Brown was sentenced to five years imprisonment on the conspiracy conviction and twenty-five years on each of his three armed bank robbery convictions. Appellant Gallagher also was sentenced to five years imprisonment on the conspiracy conviction and twenty-five years on each of his three armed bank robbery convictions. The sentences imposed on appellants Brown and Gallagher were to be served consecutively and after their serving of a fifteen year term of imprisonment on an earlier conviction in the United States District Court for the Southern District of Indiana for armed bank robbery. Appellant Adams was sentenced to five years on the conspiracy count and to twenty years on each of his six armed bank robbery convic-

## I

Appellants press a number of contentions on appeal in their effort to have the convictions reversed and the case remanded to the district court for a new trial. First, appellants argue that the district court erred on two occasions when it dismissed two regular jurors, a Mrs. George and a Mr. Morgan, and replaced them with alternate jurors.

### Dismissal of Juror George

Appellants contend that the district court committed reversible error when it dismissed Mrs. George from the jury without notice to counsel, without a record, without personally determining the merits of discharging Mrs. George, and without having the defendants present. Appellants rely on this Court's decision in *United States v. Gay*, 522 F.2d 429 (6th Cir. 1975). In *Gay*, "[w]e h[e]ld that it was error for the District Judge to engage in discussions with members of the jury after it was impaneled and to consider requests for excuses out of the presence of the defendant and without giving notice to defense counsel." 522 F.2d at 435. We determined that "[t]he defendant should have an opportunity to object to requests for excuses from the jury and to make a record of the proceedings." 522 F.2d at 435. The defendant's conviction in *Gay* was reversed and a new trial was ordered because there was no record made of the decision to dismiss two regular jurors and this Court had to assume prejudice to the defendant in the absence of a record.[3]

Thus, appellants would be raising a serious issue if their representations about the circumstances of the dismissal of Mrs. George from the jury were correct. Their allegations, however, are inconsistent with the record.

Approximately one week before the end of trial, on May 8, 1976, defense counsel and appellant Gallagher (who was representing himself) were notified by the district court that the Court proposed to excuse Mrs. George from the jury. A chambers conference was held, during which counsel had the opportunity to inquire as to the reasons why the district judge intended to dismiss Mrs. George. A transcript of the conference was made.

That record shows that the district judge informed counsel and appellant Gallagher that Mrs. George had a serious argument with her husband on the telephone the night before. The judge was alerted to this fact by the U.S. Marshal who, by the consent of the jurors, had been monitoring the jurors' phone calls in order to make sure that the jurors were not subject to outside influences. The district judge explained to those present at the conference that he wished to excuse Mrs. George because the jury would not start deliberating on a verdict for another week and he did not believe that it was wise to have on the jury a person who was upset and anxious over her marriage. The judge added that he had considered writing a letter to Mrs. George's husband so that he could explain to him the importance of the case but then decided that the dismissal of Mrs. George would be the better course of action. Counsel for appellant Adams asked the judge if Mrs. George's problem was a "domestic situa-

---

tions, the sentences to be served consecutively. Appellant Hale was sentenced to five years on the conspiracy count and to twenty years on each of his three armed bank robbery convictions, the sentences to be served consecutively. Also, appellants Hale and Adams were to serve these sentences after serving their sentence in a state conviction for grand theft. Appellant Colwell was sentenced to five years on the conspiracy conviction and to a total of 105 years imprisonment for the five armed bank robbery convictions. Appellant Pitts was sentenced to five years imprisonment on his conspiracy conviction.

3. By contrast, the Second and Seventh Circuits have upheld as without error summary action by the district judge dismissing a regular juror and replacing the regular juror with an alternate when defense counsel did not even receive notice of the action. *See United States v. Houlihan*, 332 F.2d 8, 12–13 (2d Cir.), *cert. denied*, 379 U.S. 828, 85 S.Ct. 56, 13 L.Ed.2d 37 (1964); *United States v. Pacente*, 503 F.2d 543 (7th Cir.), *cert. denied*, 419 U.S. 1048, 95 S.Ct. 623, 42 L.Ed.2d 642 (1974); *United States v. Garafolo*, 385 F.2d 200, 207–08 (7th Cir. 1967), *rev'd on other grounds*, 390 U.S. 144, 88 S.Ct. 841, 19 L.Ed.2d 970 (1968).

tion," and the judge said yes. The judge then stated that he could not talk to Mrs. George in order to find out just how pressured she felt from the quarrel with her husband because if he were to talk to Mrs. George, he would have to dismiss her and nothing would be gained. The conference then ended. No one at the conference raised any objection to the dismissal of Mrs. George. Nor did anyone object to the absence of the appellants.

After the conference, a U.S. Marshal was directed to take Mrs. George from the jury, and she was informed that she was excused, and she was replaced by an alternate. Never during the subsequent trial proceedings did anyone raise any objection to Mrs. George's dismissal. Nor was there any objection registered to the absence of the appellants from the conference concerning the dismissal.

On this record, we hold that no reversible error was committed by the district judge when dismissing Mrs. George from the jury. Unlike the situation in the *Gay* case, here the district judge notified counsel and held an in-chambers conference when he was alerted by the U.S. Marshal of an incident that raised a question concerning Mrs. George's service. There were no *ex parte* discussions with members of the jury. Appellants' representations that there was no notice to counsel and no record are without factual foundation.

■ Appellants' assertion that the district judge failed to determine the merits of discharging Mrs. George from the jury either is premised on a misstatement of fact or implies an incorrect view of the law. The law is that although a district court's decision to dismiss a regular juror and to replace that juror with an alternate is subject to review on appeal, the trial judge's action will not be grounds for reversal unless an abuse of discretion has been committed. *United States v. Gay, supra*, 522 F.2d at 435; *United States v. Florea*, 541 F.2d

568, 573 (6th Cir. 1976), *cert. denied*, 430 U.S. 945, 97 S.Ct. 1579, 51 L.Ed.2d 792 (1977). Moreover, the consent of the parties to the dismissal need not be obtained. *United States v. Gay, supra; United States v. Florea, supra.*

■ On the record before us, there can be no doubt that the district court did not abuse its discretion by dismissing Mrs. George from the jury. The district judge determined that Mrs. George would be affected by the quarrel with her husband and that her ability to shoulder her responsibilities as a member of the jury had been impaired, and appellants' attorneys did not dispute the judge's evaluation of the situation. When the judge indicated that the wisest course to follow was to excuse Mrs. George, defense counsel raised no objection. The district judge's action can hardly be described as arbitrary. *See United States v. Cameron*, 464 F.2d 333 (3d Cir. 1972) (juror properly excused because juror continually falling asleep); *United States v. Hoffa*, 367 F.2d 698 (7th Cir. 1966), *vacated on other grounds*, 387 U.S. 231, 87 S.Ct. 1583, 18 L.Ed.2d 738 (1967) (juror properly excused because juror's mother had become seriously ill); *United States v. Houlihan*, 332 F.2d 8 (2d Cir.), *cert. denied*, 379 U.S. 828, 85 S.Ct. 56, 13 L.Ed.2d 37 (1964) (juror properly excused because juror was a nurse and her patient had suffered a heart attack).

We also reject appellants' assertion that the district judge committed reversible error by not having all the appellants present at the conference. Appellants' argument is based primarily on the applicability of Rule 43(a) of the Federal Rules of Criminal Procedure to the present case. That Rule provides:

"The defendant shall be present at the arraignment, at the time of the plea, at every stage of the trial including the impaneling of the jury and the return of the verdict, and at the imposition of sentence, except as otherwise provided by this rule."

An in-chambers conference concerning the dismissal of a juror is not expressly exempted in Rule 43(b) or (c),[4] and in *United States v. Gay, supra,* 522 F.2d at 435, this Court determined that an in-chambers conference concerning the dismissal of a juror would be a stage in the trial within the meaning of Rule 43(a).

Appellants' right to be present at the in-chambers conference was guaranteed only by Rule 43(a), however, and was not constitutionally required, as was intimated by appellants in their brief. Although Rule 43(a) does have its constitutional underpinning, the right of presence stated in the Rule is more far-reaching than the right of presence protected by the Constitution.[5] The Constitution only grants to the criminal defendant the "right to be present at all stages of the trial where his absence might frustrate the fairness of the proceedings . . . ." *Faretta v. California,* 422 U.S. 806, 819 n. 15, 95 S.Ct. 2525, 2533, 45

---

**4.** Rule 43(b) and (c) of the Federal Rules of Criminal Procedure provides:

(b) Continued Presence Not Required. The further progress of the trial to and including the return of the verdict shall not be prevented and the defendant shall be considered to have waived his right to be present whenever a defendant, initially present,

(1) voluntarily absents himself after the trial has commenced (whether or not he has been informed by the court of his obligation to remain during the trial), or

(2) after being warned by the court that disruptive conduct will cause him to be removed from the courtroom, persists in conduct which is such as to justify his being excluded from the courtroom.

(c) Presence Not Required. A defendant need not be present in the following situations:

(1) A corporation may appear by counsel for all purposes.

(2) In prosecutions for offenses punishable by fine or by imprisonment for not more than one year or both, the court, with the written consent of the defendant, may permit arraignment, plea, trial, and imposition of sentence in the defendant's absence.

(3) At a conference or argument upon a question of law.

(4) At a reduction of sentence under Rule 35.

**5.** The first Supreme Court opinions on the defendant's right to presence at trial, *Hopt v. Utah,* 110 U.S. 574, 4 S.Ct. 202, 28 L.Ed. 262 (1884), and *Lewis v. United States,* 146 U.S. 370, 13 S.Ct. 136, 36 L.Ed. 1011 (1892), contained broad dictum indicating that a trial could never proceed without the defendant's presence. In *Diaz v. United States,* 223 U.S. 442, 32 S.Ct. 250, 56 L.Ed. 500 (1912), however, the Supreme Court distinguished these cases, holding that in a noncapital case in which the defendant is free on bail, the defendant could waive his right to be present at trial by voluntarily absenting himself from the trial proceed- ings. In *Snyder v. Massachusetts,* 291 U.S. 97, 54 S.Ct. 330, 78 L.Ed. 674 (1934), Justice Cardozo stated that the *Hopt* and *Lewis* cases were based on common law principles and were not constitutional cases. *Snyder* held that a defendant did not have a constitutional right to be present at a view of the scene of the alleged crime because the constitutional right to presence was limited to that presence meaningful to the implementation of the Sixth Amendment right to confront adverse witnesses and to the due process interest of protecting the ability of the defendant to aid in his defense. Justice Roberts dissented, contending that there was also a due process interest in the defendant seeing and observing the trial so that there would be confidence in courts as instruments of justice. *Snyder v. Massachusetts,* 291 U.S. 97, 123, 131–32, 54 S.Ct. 336, 78 L.Ed. 674 (1934) (Roberts, J., dissenting). *See United States v. Gregorio,* 497 F.2d 1253, 1258 (4th Cir.), *cert. denied,* 419 U.S. 1024, 95 S.Ct. 501, 42 L.Ed.2d 298 (1974). Nevertheless, in *Illinois v. Allen,* 397 U.S. 337, 90 S.Ct. 1057, 25 L.Ed.2d 353 (1970), the Supreme Court briefly reviewed this development in the cases, noting that the broad dictum of *Hopt* and *Lewis* had been rejected as constitutional law in *Diaz* and *Snyder,* and then concluded that a defendant could waive his right to be present at trial by disruptive conduct during the trial proceedings.

The original Rule 43 was a restatement of the law as to a defendant's right to presence at trial according to *Lewis v. United States, supra,* and as to waiver of a defendant's right to presence according to *Diaz v. United States, supra.* Federal Rule of Criminal Procedure 43, Advisory Committee Note 1. Because *Lewis,* according to Justice Cardozo in *Snyder,* stated not a constitutional principle but the common law rule, it can be seen how Rule 43 has a much broader scope of application than the constitutional right of presence defined in *Snyder.* The major concern behind the 1975 Amendments to Rule 43 was to revise the rule to reflect *Illinois v. Allen, supra.*

L.Ed.2d 562 (1975). *See Snyder v. Massachusetts*, 291 U.S. 97, 106–08, 54 S.Ct. 330, 78 L.Ed. 674 (1934).[6] An in-chambers conference concerning the dismissal of a juror, while a stage of the trial within the meaning of Rule 43(a) and not excluded by Rule 43(b) or (c), is not a stage of the trial when the absence of the defendant would frustrate the fairness of the trial so long as counsel for the defendant is present. *See United States v. Jorgenson*, 451 F.2d 516, 521 (10th Cir. 1971), *cert. denied*, 405 U.S. 922, 92 S.Ct. 959, 30 L.Ed.2d 793 (1972).[7]

■ There was no violation of Rule 43(a) prejudicial to the substantial rights of the appellants. There is not the slightest doubt that appellants were not prejudiced by their absence from the conference, and because we have a record of the conference, any error under Rule 43(a) can be deemed harmless under Rule 52(a) of the Federal Rules of Criminal Procedure.[8] *United States v. Florea, supra*, 541 F.2d at 573. *See Rogers v. United States*, 422 U.S. 35, 40, 95 S.Ct. 2091, 45 L.Ed.2d 1 (1975). Appellants' argument on this issue ignores the fact that counsel for appellants were present at the conference to protect appellants' rights. Defense counsel zealously defended the interests of their clients, and there is nothing before us to indicate that they were any less vigilant at this conference. There was simply no "reasonable possibility of prejudice" in the present case. *United States v.*

*Reynolds*, 489 F.2d 4, 8 (6th Cir. 1973), *cert. denied*, 416 U.S. 988, 94 S.Ct. 2395, 40 L.Ed.2d 766 (1974).

■ In addition, appellants waived any claim of error as to their right to be present at the conference. No objection to the absence of all of the appellants from the conference was raised by defense counsel or appellant Gallagher, who were present, and no objection was raised thereafter during the trial. *See United States v. Jones*, 542 F.2d 186, 213 (4th Cir. 1976).

## Dismissal of Juror Morgan

Appellants also contend that the district court committed reversible error when discharging a second juror, Mr. Morgan, whose wife was reported to have received threats of violence. The record shows that on May 4, 1976, several weeks into trial, the district judge called counsel and appellant Gallagher to an in-chambers conference before the scheduled starting time for court. The district judge told those present at the conference that he had decided to excuse Mr. Morgan from the jury because Morgan's wife said that she had received a threatening phone call. A U.S. Marshal had reported to the judge that Mr. Morgan's wife was told that, "You tell your husband he better come to the right decision." The caller did not explain what the right decision was. The judge said that, whatever decision the

---

6. Justice Cardozo in *Snyder v. Massachusetts, supra*, 291 U.S. at 107–08, 54 S.Ct. at 333, stated that the defendant has a constitutional right to be present at trial "to the extent that a fair and just hearing would be thwarted by his absence, and to that extent only."

7. In *United States v. Jorgenson*, 451 F.2d 516 (10th Cir. 1971), *cert. denied*, 405 U.S. 922, 92 S.Ct. 959, 30 L.Ed.2d 793 (1972), in-chambers conferences were held without the presence of the defendant. At the conferences, the Government attorney disclosed his witnesses and reported the results of an investigation into the reason why the wife of one of the witnesses had been taking notes of previous testimony in the trial. (Such conferences would not be legal conferences within the now existing exemption

of Rule 43(c)(3) and hence within the provision of Rule 43(a), but at the time of the *Jorgenson* decision Rule 43 had not yet been amended to make clear that legal conferences were not subject to Rule 43(a).) In *Jorgenson*, the Tenth Circuit stated that "a criminal defendant does not have an absolute constitutional right to be a participant in such in camera discussions when his lawyer is present . . ." and held that there was no reversible error under Rule 43(a) because the defendant had suffered no prejudice.

8. Rule 52(a) of the Federal Rules of Criminal Procedure provides:
   (a) Harmless Error. Any error, defect, irregularity or variance which does not affect substantial rights shall be disregarded.

caller intended the jury to reach, under the circumstances it would be better if Mr. Morgan were excused from the jury.

Defense counsel for appellant Hale asked if Mr. Morgan was aware of the threat, and the judge said that he was. Defense counsel for appellant Pitts asked how that information was passed to Mr. Morgan, and the judge stated that his wife had told him when she had visited him two days earlier, on Sunday. Defense counsel for appellant Adams asked if the threat to Mr. Morgan's wife had been communicated to the other members of the jury. The judge said that he did not believe that it had been but that he wished to interrogate Mr. Morgan so that Mr. Morgan could state for the record whether the information about the threat had been passed to the other jurors.

Mr. Morgan was brought into the conference. The judge first questioned him about the threatening phone call to his wife and then inquired if he had told the other jurors about the threat. Mr. Morgan stated that his wife had received four threatening phone calls and that he had not communicated this information to the other jurors but had only told the U. S. Marshals. The judge told Mr. Morgan that he was excused from the jury and that he was not to talk about the case.

After Mr. Morgan left the conference, a Government attorney told the judge that the FBI had asked him to ask the Court for permission to request Mrs. Morgan to take a polygraph test about the threats. The judge answered that he would like to defer a decision on that request for the moment, especially since it was possible that Mrs. Morgan had fabricated the story about the threats so as to get her husband off the jury. Defense counsel for appellant Colwell then asked if Mr. Morgan's representations that he had not told the other jurors could be relied upon. The judge replied that he was afraid of discussing the matter with the other jurors because he would be doing "enormous harm" if did. The judge added

that Mr. Morgan had followed his instructions to inform the U.S. Marshals if anyone attempted to influence the jury and that when Mr. Morgan had told the U. S. Marshals on Sunday, the Marshals told Morgan not to tell the other jurors about the threat. Counsel for appellant Colwell asked if defense counsel could poll the jury after the return of the verdict, and the judge said that they could.

Once the conference was concluded, the judge and counsel went to the courtroom, and the trial proceeded. The judge informed the other jurors that Mr. Morgan had been excused from the jury for personal reasons of Mr. Morgan's. Defense counsel made neither an objection to the dismissal nor a motion for a mistrial. Defense counsel did not even choose to poll the jury after the return of the verdict. Nor was there ever any objection, either during the conference or during the subsequent trial proceedings, to the absence of the appellants from the chambers conference concerning the dismissal of Mr. Morgan from the jury.

■ Appellants raise two basic claims of error as to Mr. Morgan's dismissal. First, appellants argue that the district judge erred by not conducting a hearing in the presence of appellants and their counsel before dismissing Mr. Morgan and by denying defense counsel during the hearing that was held the right to cross-examine the juror Morgan under oath and the right to argue about the wisdom of the dismissal. We conclude that this argument has no merit. ●

The district court did notify counsel and did hold on the record a conference at which defense counsel were able to raise questions about the dismissal, as required by *United States v. Gay, supra*, 522 F.2d 429, and it was not until the district judge had talked to counsel and had questioned Mr. Morgan at the conference that Mr. Morgan was informed that he was excused

from the jury. Moreover, the judge did not deny counsel the opportunity to cross-examine Mr. Morgan. The problem did not arise. The judge handled the interrogation of Mr. Morgan to the apparent satisfaction of defense counsel. Nor was defense counsel denied the opportunity at the conference to argue about the wisdom of dismissing Mr. Morgan from the jury. The problem did not arise. It was obvious to everyone at the conference that the sound exercise of discretion by the district judge required the dismissal of Mr. Morgan from the jury. Finally, the absence of the appellants from the conference was not reversible error under Federal Rule of Criminal Procedure 43(a). Just as in the case of the dismissal of Mrs. George, the record shows that appellants were not prejudiced by their absence from the conference, *United States v. Florea, supra*, 541 F.2d 568, and appellants waived any error because no objection was raised to their absence at any time during the trial proceedings.

The real issue raised by appellants as to Mr. Morgan's dismissal from the jury is stated in their second claim of error. Appellants contend that there was a rebuttable presumption of prejudice applicable in the present case due to the communication to Mr. Morgan from his wife as to the threats and that the presumption was unrebutted because the district judge declined to interrogate the other members of the jury to determine if they had learned of the threats to Mrs. Morgan.

In *Mattox v. United States*, 146 U.S. 140, 150, 13 S.Ct. 50, 53, 36 L.Ed. 917 (1892), the Supreme Court stated:

"Private communications, possibly prejudicial, between jurors and third persons, or witnesses, or the officer in charge, are absolutely forbidden, and invalidate the verdict, at least unless their harmlessness is made to appear."

In *Mattox*, the bailiff had remarked to at least part of the jury that the defendant had killed two other men. No one from the jury was excused after that remark.

This Court applied the *Mattox* rule in *Stone v. United States*, 113 F.2d 70 (6th Cir.

1940). In *Stone*, a juror was offered a bribe. The juror immediately reported the incident to the court. The judge called the juror into chambers, and the juror, under oath, stated that he had talked to no one else concerning the bribe, and despite the offered bribe, he could decide the case fairly. The judge then informed the parties of the juror's statements. After the defendants in *Stone* expressed an opposition to handling the problem by having the improperly contacted juror dismissed and explaining the discharge to the other jurors as being at the one juror's request, the judge interrogated the jury to determine if they had been prejudiced by any outside influences. The juror who had been approached was not excused, the trial proceeded, and the defendants were ultimately convicted. This Court reversed, stating that the defendants' motion for a mistrial should have been granted by the trial judge and holding that the rights of the defendants had been prejudiced because the juror who had been offered the bribe remained on the jury and because the whole jury had in effect been exposed to the outside communication by the interrogation of the jury by the judge concerning the bribe. *See Krause v. Rhodes et al.*, 570 F.2d 563, No. 76–1095 (6th Cir. September 12, 1977).

Appellee United States points out that in the present case, Mr. Morgan was excused from the jury, whereas in *Mattox* and *Stone*, the improperly contacted jurors remained on the jury and participated in the reaching of a verdict. The United States thus concludes that the rebuttable presumption of prejudice does not apply to the present case.

Certainly it can be said that the prejudice flowing from an improperly contacted juror participating in jury deliberations was not present in the instant case. In *United States v. Ferguson*, 486 F.2d 968 (6th Cir. 1973), however, this Court applied the *Mattox* presumption in a case in which the improperly contacted juror was excused from the jury. In *Ferguson*, a juror, one Austin, improperly talked about the case with a friend, who also happened to be a

friend of one of the defendants. When that defendant's counsel brought the matter to the attention of the Court, the judge interrogated the juror Austin and then polled the other members of the jury, asking whether any juror had discussed the guilt or innocence of any of the defendants with any other juror and whether any juror had made up his or her mind as to the guilt or innocence of any of the defendants. The jurors' answers revealed that Austin had talked to at least one other juror about the case, even though Austin had told the judge that he had not so talked to any other juror. The judge excused Austin from the jury and explained to the other jurors that Austin was excused because of social contact with a friend of one of the defendants. The trial continued, and the defendants were ultimately convicted.

This Court reversed. Despite the removal of the improperly contacted juror Austin, the *Mattox* presumption of prejudice was determined still to be applicable and the presumption was held not to have been rebutted. Austin had talked to one of the other jurors, who could easily infer that Austin was excused because of an attempt to influence the jury improperly. The jurors with whom Austin had not talked were made aware of Austin's contact with a friend of one of the defendants and thus were able to form suspicions similar to those of the juror who had talked with Austin. The whole jury was contaminated by the outside communication either directly by Austin or indirectly by the judge's interrogation and subsequent explanation for Austin's dismissal.

▮ The present case is distinguishable from *United States v. Ferguson, supra,* 486 F.2d 968. In the present case, the presumption was rebutted.[9] Not only was Mr. Mor-

gan excused from the jury, the record also shows that there was no communication to the other jurors by Morgan as to the threats to his wife and that the district judge did not dismiss Mr. Morgan in a way that would arouse any suspicions that there had been an improper attempt to influence the jury. The other members of the jury were not contaminated by Mr. Morgan's knowledge.

Appellants argue, though, that the *Mattox* presumption of prejudice can only be rebutted by facts brought out in a hearing in which jurors are interrogated as to their knowledge of the improper communication that has caused the dismissal of a juror and that in the present case, because there was no such interrogation, the presumption of prejudice stood unrebutted. Such a holding would, however, lead to an absurd result.

If a district judge must interrogate the members of the jury in order to establish facts to rebut the *Mattox* presumption of prejudice when an improperly contacted juror has been dismissed, the judge will be forced to cause actual prejudice to result from the jury being exposed, through the judge's interrogation, to the same outside communication as the contacted juror. This Court in both *Stone v. United States, supra,* 113 F.2d 70, and *United States v. Ferguson, supra,* 486 F.2d 968, emphasized how prejudice was created by the judge's interrogation of the jury when the judge was attempting to determine the extent to which the jury had learned of the improper communication to a juror. In the present case, the district judge was quite correct in fearing that he would do "enormous harm" if he were to interrogate the jurors.

▮ A district judge must have the discretion to decline to interrogate the jurors in this situation.[10] We can hardly require

---

9. Once the presumption of prejudice applies, there is a requirement for notice and opportunity to be heard. *See Remmer v. United States,* 347 U.S. 227, 74 S.Ct. 450, 98 L.Ed. 654 (1954). In the present case, this requirement was satisfied.

10. When the district judge declines to interrogate the improperly contacted juror in this situ-

ation, defense counsel can poll the jury after the return of the verdict. In the present case, counsel was made aware of this option in the in-chambers conference concerning the dismissal of Mr. Morgan from the jury, but failed to take advantage of this option.

the district judge to interrogate the jurors, creating a situation appropriate for the declaring of a mistrial, *see Stone v. United States, supra,* 113 F.2d at 77–78, in order to determine facts so that a presumption of prejudice can be rebutted. The orderly administration of justice requires a procedure under which a trial judge may in a proper case, dismiss a juror who has been improperly contacted as an alternative to declaring a mistrial. *See Krause v. Rhodes et al., supra,* 570 F.2d at 569.

▇ We conclude that in the present case the district judge went far enough, having established all the facts that he could without questioning the jury, and did not need to interrogate the jurors in order to establish the facts necessary to rebut the *Mattox* presumption of prejudice. For us to hold otherwise would mean that for all practical purposes the rebuttable presumption of prejudice could not be rebutted; it is simply unacceptable to hold that there is a conclusive presumption of prejudice whenever a juror has received an improper communication when the improperly contacted juror is excused from the jury. The Supreme Court in *Mattox v. United States, supra,* 146 U.S. 140, 13 S.Ct. 50, 36 L.Ed. 917, requires only the application of a rebuttable presumption of prejudice when a juror has received an improper communication and the juror is not excused from the jury. To apply a conclusive presumption of prejudice in a case in which the contacted juror is excused would be both anomalous and detrimental to the effective operation of the criminal justice system.

To be sure, in *Ferguson,* the juror Austin stated that he had not talked to the other members of the jury about the case, just as in the present case, Mr. Morgan stated that he did not talk to the other jurors about the threats to his wife, and in *Ferguson,* the judge's interrogation of the jury showed that Austin had talked about the case to at least one other juror. Not always will a district judge be able to credit a juror's statement that he has not talked to other jurors about an improper communication, and in *Ferguson,* the district judge could not accept Austin's statements. Austin had not reported the improper communication himself, and when confronted with the fact of the improper contact (which he was partly responsible for initiating), Austin gave a self-serving statement about the contact before denying that he had talked to any other jurors. The judge in *Ferguson* thus did not have the discretion to decline to investigate further, and further investigation could not avoid creating an impact upon the jury that prejudiced the defendants' right to a fair trial.

By contrast, in the present case, the district judge had reason to accept Mr. Morgan's statements when he denied talking to the other jurors about the threats. Morgan had reported the threats to his wife to the U.S. Marshals, and he gave a full accounting of the threats at the conference. The district judge in the present case had the discretion not to go farther in the investigation.

## II

▇ A second main contention of appellants on appeal is that the district court erred in not granting their motions for acquittal, made pursuant to Rule 29 of the Federal Rules of Criminal Procedure, because there was insufficient evidence to support the convictions of appellants Gallagher, Colwell, and Adams for the armed bank robbery of the Winters National Bank in Dayton, Ohio, as charged in Count VIII of the indictment. Appellants argue that there was no evidence actually linking appellants Gallagher, Adams, and Colwell to that robbery. Appellee United States admits that the jury was presented with a close question to consider with respect to Count VIII of the indictment.

In *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942), the Supreme Court stated:

"It is not for us to weigh the evidence or to determine the credibility of witnesses.

The verdict of a jury must be sustained if there is substantial evidence, taking the view most favorable to the Government, to support it."

See Hamling v. United States, 418 U.S. 87, 124, 94 S.Ct. 2887, 41 L.Ed.2d 590 (1974). We conclude that the evidence produced at trial, taken in the light most favorable to the Government, was sufficient to support the jury's verdict.

There is little question that the robbery of the Winters National Bank in Dayton, Ohio, on May 30, 1975, was done in a manner similar to the robberies that were proved to have been done by the appellant Brown bank robbery organization. The evidence at trial showed that appellant Gallagher and unindicted co-conspirators Larry Shoupe, William Willison, and Terry Seth had traveled to the Winters National Bank in early May, 1975, to look it over in preparation for a robbery attempt. Later in the month, appellant Gallagher, Shoupe, Willison, and Seth returned to rob the bank. They were scared away when they saw inside the bank men who were thought to be FBI agents. On May 30, 1975, the Winters National Bank was robbed, but not by Shoupe, Willison, and Seth, according to their testimony. On the day of the robbery, three men wearing ski masks and gloves and carrying guns entered the bank and ordered everyone to "hit the floor." One of the robbers remained in the lobby to keep the situation under control, while the other two took the money from behind the tellers' counters. The robbers left the bank after having been in the bank for approximately one minute. A stolen 1966 Buick bearing stolen license plates was used as the getaway car.

Evidence of the actual participation in the robbery by appellants Gallagher, Adams, and Colwell was circumstantial, but sufficiently linked appellants Gallagher, Adams, and Colwell to the robbery. First, unindicted co-conspirator Sterling Walters testified that appellants Adams and Colwell went to unindicted co-conspirator Gladys Kerns' house the morning of the robbery of the Winters National Bank and there showered and changed clothes. Kerns, who was Colwell's sister, had a police scanner in her house at the time of the robbery. The jury could thus infer that the Kerns house was used as a "safe house" by appellants Adams and Colwell after robbing the Winters National Bank.

Second, bank surveillance photographs were taken at the robberies of the First National Bank of Fairborn, Ohio, on April 18, 1975, and the Third National Bank, Salem Avenue Branch of Dayton, Ohio, on May 1, 1975, as well as at the robbery of the Winters National Bank. These photographs were admitted into evidence. Appellants Adams and Colwell participated in the robbery of the First National Bank in Fairborn, Ohio, and appellants Adams and Gallagher participated in the robbery of the Third National Bank, Salem Avenue Branch, in Dayton, Ohio. The jury was thus able to compare the photographs taken at the Winters National Bank with photographs taken at bank robberies in which the accused appellants did participate and with their appearances at trial.

The bank surveillance photographs linked appellant Gallagher to the robbery of the Winters National Bank in another way. Appellant Gallagher's ex-wife, Calista Davenport, testified that Gallagher had a bad sinus condition and had the habit of holding the bridge of his nose with his hand. The photographs of the robbery of the Third National Bank, Salem Avenue Branch, in Dayton, Ohio, (in which appellant Gallagher participated) show Gallagher holding the bridge of his nose. The photographs of the robbery of the Winters National Bank also show one of the robbers (who was approximately of the same build as Gallagher) holding the bridge of his nose in the same manner as Gallagher had in the lobby of the Third National Bank and, according to appellee's brief, in the same manner as appellant Gallagher had during the trial itself.

Finally, the Assistant Branch Manager of the Winters National Bank, Steven Canter, testified as to the general physical characteristics of the three robbers, which matched those of appellants Gallagher, Adams, and Colwell. Although such eyewitness identifications of physical characteristics in the context of the present case would be insufficient evidence considered alone, the jury could consider Canter's testimony as additional evidence that linked appellants Gallagher, Adams, and Colwell to the robbery of the Winters National Bank.

The other contentions argued on appeal by appellants are found to be without merit. The judgments of the district court are affirmed.